Approved: *[signature]*
KEVIN MEAD
Assistant United States Attorney

Before:   HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

------------------------------------x
                                    :   **22 MAG 0097**
UNITED STATES OF AMERICA             :   SEALED COMPLAINT
                                    :
         - v. -                      :   Violations of 18 U.S.C.
                                    :   §§ 371 and 1001
                                    :
ROBERT ALCANTARA,                    :
                                    :   COUNTY OF OFFENSE:
                                    :   BRONX
              Defendant.             :
                                    :
------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

KIRAN MATHEW, being duly sworn, deposes and says that he is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and charges as follows:

### COUNT ONE
### (Conspiracy to Traffic Firearms)

1. From at least in or about September 2019 up to and including in or about November 2021, in the Southern District of New York and elsewhere, ROBERT ALCANTARA, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, trafficking in firearms, in violation of Title 18, United States Code, Section 922(a)(1)(A).

2. It was a part and an object of the conspiracy that ROBERT ALCANTARA, the defendant, and others known and unknown, not being licensed importers, licensed manufacturers, and licensed dealers of firearms or ammunition within the meaning of Chapter 44, Title 18, United States Code, would and did willfully and knowingly engage in the business of importing, manufacturing, and dealing in firearms, and in the course of such business would and did ship,

1

transport, and receive firearms in interstate and foreign commerce, in violation of Title 18, United States Code Section 922(a)(1)(A) and (a)(1)(B).

### Overt Acts

3.  In furtherance of the conspiracy and to effect the illegal objects thereof, ROBERT ALCANTARA, the defendant, together with others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

   a.  On or about November 20, 2021, ALCANTARA purchased parts for 45 firearms for resale and then transported those parts through the Bronx, New York.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (False Statements)

4.  On or about November 20, 2021, in the Southern District of New York and elsewhere, ROBERT ALCANTARA, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully did make materially false, fictitious, and fraudulent statements and representations, to wit, during an interview with a Special Agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, ALCANTARA falsely stated (i) that he had never sold or transferred ownership of a firearm to any other individual and (ii) that he had never transported a firearm to the Dominican Republic, when in truth and in fact, ALCANTARA was aware that he had sold or transferred ownership of firearms before, and had transported firearms to the Dominican Republic.

(Title 18, United States Code, Sections 1001 and 2.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

5.  I am a Special Agent with ATF and have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where

the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

6.   ROBERT ALCANTARA, the defendant, has been involved in the sale or attempted sale of what appear to be more than 100 firearms.  Most of the firearms are "ghost gun" handguns that ALCANTARA purchased in incomplete form and then finished at a workstation at his house, although ALCANTARA was also involved in the sale of rifles.  ALCANTARA sold most of the firearms in the Dominican Republic.  When interviewed by law enforcement about his sales and shipments of firearms, ALCANTARA then falsely stated that he had never sold firearms or transported them to the Dominican Republic.

## Background on "Ghost Guns"

7.   Based on my training and experience, I know the following:

   a.   Pursuant to the Gun Control Act, all firearms manufactured or imported into the United States since October 22, 1968 must bear an identifying serial number.

   b.   One increasingly common way in which criminals who wish to possess untraceable firearms evade this requirement is through the use of what are colloquially known as "ghost guns," or privately made firearms ("PMFs").

   c.   PMFs are firearms without serial numbers and other manufacturer or importer markings, and are virtually untraceable by law enforcement officials.  These firearms can be finished and/or assembled with the aid of common household tools or specialized tools and equipment using gun build kits or aggregated gun parts purchased online and elsewhere.

   d.   Criminals can purchase the tools and component parts necessary to assemble or "machine"[1]  PMFs.  For example,

---

[1] "Machining" is the process of cutting, shaping, or removing material from a workpiece using a machine tool.

3

individuals may purchase the upper and lower receivers of firearms. A "lower receiver" or "frame" is the basic unit of a firearm in pistols which houses the trigger and magazine. An "upper receiver" or "slide" is the upper portion of a pistol, which chambers ammunition into the barrel and extracts the spent casing after the round is fired. Companies such as an unnamed "ghost gun" manufacturer ("Ghost Gun Manufacturer-1"), described in additional detail below, frequently sell both upper receivers and "unfinished" lower receivers. The "unfinished" lower receivers (often referred to as "80%" or "80% finished" or "80% complete" in industry parlance) are advertised as being 80 percent complete and as not being a "firearm" as the term is defined in 18 U.S.C. § 921(a)(3), but which can be easily further finished and assembled into a firearm receiver, and then combined with an upper receiver or "slide" to create a fully functional firearm.[2]  A photograph of an upper and lower receiver is below for reference:



---

[2] I know from my experience with ATF that PMF kits are generally referred to as "80%" firearm kits by the public. This is because, in order to avoid regulation, PMF kit manufacturers market these kits (or PMF frames and receivers) as being "80% complete." ATF does not use this terminology and does not use percentages of completion to determine if a firearm is an unfinished part or firearm (or frame or receiver) as defined in Title 18 of the United States Code or the Code of Federal Regulations.  A large number of PMF suppliers, however, use some version of "80" or "80%" in their name.

4

   e. Companies such as Ghost Gun Manufacturer-1 also provide simple "how-to" guides on their websites explaining how the lower receivers can be easily machined and combined with upper receivers to produce fully functional firearms.

### Seizure of Parts for 45 "Ghost Guns" from ALCANTARA and Interview of ALCANTARA

 8. Based on my involvement in the investigation, I know the following:

   a. On or about November 20, 2021, law enforcement observed ROBERT ALCANTARA, the defendant, and a coconspirator ("CC-1") purchase approximately 46 upper receivers and 45 lower receivers at a gun show in Morgantown, Pennsylvania.

   b. On or about November 20, 2021, law enforcement stopped ALCANTARA and CC-1 while driving in the Bronx, New York. Law enforcement recovered the upper and lower receivers ALCANTARA had purchased, photographs of which are below:

 

   c. Law enforcement also seized a cellphone (the "Alcantara Phone").

   d. Law enforcement arrested ALCANTARA, and the following occurred during his post-arrest interview:

     i. ALCANTARA was read his Miranda rights, waived those rights, and agreed to speak to law enforcement.

    ii. ALCANTARA said that he had purchased the upper and lower receivers for approximately $360 per pair, i.e., approximately $16,200 in total.

    iii. ALCANTARA said that CC-1 had helped him load the upper and lower receivers into his vehicle.

    iv. ALCANTARA said that he resided at an address in Providence, Rhode Island (the "Providence Address"), and was transporting the upper and lower receivers from Pennsylvania to Rhode Island.

    v. ALCANTARA said that he was going to turn the upper and lower receivers into completed firearms.

    vi. ALCANTARA said that he has a YouTube channel where he discusses firearms.

    vii. ALCANTARA stated at one point in the interview that he had 50 similar firearms at his house in Rhode Island, but ALCANTARA later stated inconsistently that he did not have 50 firearms at his house in Rhode Island.

    viii. ALCANTARA stated at one point in the interview that he had purchased 20 similar "ghost gun" kits in August 2020, but ALCANTARA later stated inconsistently that he did not purchase those "ghost gun" kits.

    ix. ALCANTARA stated that he did not intend to sell the 45 firearms after he had completed them.

    x. ALCANTARA stated that he had never sold or transferred ownership of any firearm.

    xi. ALCANTARA stated that he had never transported any firearm to the Dominican Republic.

### The Alcantara YouTube Account

9. I have reviewed the Alcantara YouTube Account and observed the following:

6

  a. I have reviewed a video dated September 28, 2019 in which ROBERT ALCANTARA, the defendant, states that he has a firearm created using parts from Ghost Gun Manufacturer-1, places an extended clip into the firearm, and then successfully test-fires the firearm.  A still image from that video is below:



**ALCANTARA's "Ghost Gun" Home-Factory**

  10. Law enforcement searched the Alcantara Phone pursuant to a judicially-authorized search warrant.  Law enforcement recovered the following photographs from the Alcantara Phone:

  

**Photograph-1**     **Photograph-2**   **Photograph-3**

  11. I know from my review of the Alcantara Phone that each of the three photographs were "geotagged," meaning that the exact location where the photographs were taken are recorded in the

7

metadata for the three photographs. The metadata shows that all three photographs were taken at or near the Providence Address where ROBERT ALCANTARA, the defendant, resides.[3]

12. I know from my training and experience that the photographs above show that ROBERT ALCANTARA, the defendant, has been machining substantial numbers of "ghost guns" at the Providence Address where he resides. In particular:

    a. Photograph-1 shows machinery such as a sanding belt, a hydraulic drill press, a vise-like tool, and a dremel tool that I know from my training and experience to be tools used to machine "ghost guns." Photograph-1 also shows what appear to be five finished "ghost guns."

    b. Photograph-2 is a close-up view of the five completed "ghost guns" shown in Photograph-1. The logo of Ghost Gun Manufacturer-1 is visible on each of the five "ghost guns." In addition, the mat the five "ghost guns" are resting on appears to be branded with the name of a "ghost gun" retailer ("Ghost Gun Retailer-1"), and has printed on it instructions as to how to machine ghost guns.

    c. Photograph-3 shows eight additional firearms that appear packaged for shipment or for sale.

### ALCANTARA's "Ghost Gun" and Ammunition Purchases

13. From my review of the Alcantara Phone,[4] I have located a conversation between ROBERT ALCANTARA, the defendant, and an individual who appears to work for a ghost gun retailer ("Representative-1" and "Ghost Gun Retailer-2"). In that conversation, ALCANTARA discussed purchasing kits for substantial numbers of "ghost guns" and how to pay for those gun kits. In particular:

---

[3] The location data states, specifically, that the photographs were taken at a house directly next door to the Providence Address, but I know from my training and experience that such a discrepancy is generally within the margin of error for similar location data.

[4] Many of the messages described in this Complaint are originally in Spanish, and have been translated by a law enforcement officer fluent in Spanish. The translations provided herein are in draft form.

    a. In or about February 2021, ALCANTARA purchased kits for 12 "ghost guns" from Ghost Gun Retailer-2 in exchange for $5,200. ALCANTARA discussed depositing cash directly into Representative-1's bank account or using a money-sharing electronic application to pay for the "ghost guns" because, ALCANTARA stated, "I have many issues with my bank account I move to much money the bank suspect fraud."

    b. In or about March 2021, ALCANTARA messaged Representative-1 photographs of what appear to be completed versions of the "ghost guns," the parts for which he had purchased from Ghost Gun Retailer-2.

    c. Later in or about March 2021, ALCANTARA purchased kits for six additional "ghost guns" in exchange for $2,575.

    d. In or about April 2021, ALCANTARA purchased kits for four additional "ghost guns" and one additional upper receiver in exchange for $2,260.

    e. Later in or about April 2021, ALCANTARA purchased kits for 10 additional "ghost guns" in exchange for $4,340.

    f. In or about May 2021, ALCANTARA purchased kits for 14 additional "ghost guns" in exchange for $6,020.

    g. In or about June 2021, ALCANTARA purchased kits for 10 additional "ghost guns" in exchange for $4,630.

    h. In or about July 2021, ALCANTARA purchased kits for 10 additional "ghost guns" in exchange for $4,500.

    i. In or about August 2021, ALCANTARA purchased kits for six additional "ghost guns" in exchange for $2,850.

    j. In or about November 2021, ALCANTARA discussed purchasing a large number of "ghost gun" kits from Ghost Gun Retailer-2 at the gun show in Morgantown, Pennsylvania.

   14. From my review of the Alcantara Phone, I have located a conversation from in or about November 2021 in which ROBERT ALCANTARA, the defendant, arranged to purchase approximately $32,000 worth of various types of ammunition. In that conversation, ALCANTARA indicated that he was purchasing the ammunition on behalf of others, and sent a picture of cash in an envelope that he intended to use to pay for the ammunition.

**ALCANTARA's "Ghost Gun" Sales**

15. From my review of the Alcantara Phone, I have identified over a dozen conversations involving the messaging application Signal in which ROBERT ALCANTARA, the defendant, discussed selling firearms to "clients" in the United States or the Dominican Republic. In particular:

    a. I have reviewed a conversation with a coconspirator ("CC-2") regarding the sale or transport of ammunition in which the following occurred:

        i. In or about August 2021, ALCANTARA discussed selling a substantial quantity of ammunition to CC-2, CC-2 messaged a series of pictures showing that he had transferred approximately $4,000 to accounts in ALCANTARA's name, and ALCANTARA sent a picture of a shipping confirmation stating that he was sending a shipment to Miami, Florida.

        ii. In or about August 2021, ALCANTARA and CC-2 exchanged messages indicating either that they were meeting together in the Dominican Republic or that a shipment of ALCANTARA's was going to a destination in the Dominican Republic.

        iii. In or about September 2021, ALCANTARA and CC-2 exchanged messages indicating that ALCANTARA was delivering a large quantity of ammunition to CC-2 in Philadelphia, Pennsylvania.

    b. I have reviewed a conversation with a coconspirator ("CC-3") regarding the sale or transport of firearms in which the following occurred:

        i. In or about April 2021, ALCANTARA sent the following picture of firearms to CC-3, and shortly thereafter CC-3 messaged ALCANTARA a picture of a large payment he made in the currency of the Dominican Republic.



        ii.     In or about July 2021, ALCANTARA messaged CC-3 photographs of a large number of rifles in a context of messages indicating that they were available for sale to CC-3:



        iii.     In or about November 2021, in the context of discussing firearms, ALCANTARA messaged CC-3 that something was "ready for exportation" and sent messages indicating that the firearms would be transported to the Dominican Republic.

        iv.     In or about November 2021, ALCANTARA messaged the following pictures to CC-3 and messaged CC-3, "look, that's the inventory."

11



   c.  I have reviewed a conversation with a coconspirator ("CC-4") regarding the sale or transport of firearms in which the following occurred:

    i.  In or about July 2021, ALCANTARA messaged the below photographs of firearms available for sale, and indicated that he was in the Dominican Republic at the time:

12

 

ii.     In or about July 2021, in the context of discussing the sale of firearms, ALCANTARA messaged, "My mother is coming tomorrow. In case you wanted to send something." Based on my training and experience, I understand that ALCANTARA offered to have his mother transport firearms to the Dominican Republic if CC-4 wanted to purchase additional firearms.[5]

iii.    In or about August 2021, in the context of discussing the sale of firearms and ammunition, ALCANTARA messaged a shipping confirmation stating that a shipment was being sent to Miami, Florida.

iv.     In or about October 2021, ALCANTARA messaged CC-4 the below photograph of suitcases filled with firearms and United States currency, and the message, "On the dock of Haina,

---

[5] At his November 20, 2021 interview, ALCANTARA stated that his mother resided in the Dominican Republic.

that came." Based on my internet research, I know that Haina is a port in the Dominican Republic.[6]



d. I have reviewed a conversation with a coconspirator ("CC-5") from in or about November 2021 in which ALCANTARA stated the following:

```
Glock 19 kit $ 510
15 kit = $ 7650
Tax $ 75x15 = $ 1,125
Assemble them $ 20x15 = $ 300
Something for the trip = $ 100
Original clips $ 29.95x15 = $ 449

Total: $ 9,624
```

Based on my training and experience, I understand this to refer to the total price ALCANTARA charged to purchase, machine, and transport 15 "ghost guns."

16. From my review of the Alcantara Phone, I have also identified the below photographs of a firearm and a substantial amount of United States currency that metadata shows were taken with the Alcantara Phone in the Dominican Republic:

---

[6] Based on my review of the messages, I understand that this photo was initially forwarded to ALCANTARA, and may have been a shipment sent by another illegal firearm trafficker.

14

 

**ALCANTARA Does Not Have A License To Sell Firearms**

17. I have reviewed government records establishing that there is no record of ROBERT ALCANTARA, the defendant, possessing any federal firearms license that would allow him to lawfully sell firearms or applying for such a license.

WHEREFORE, I respectfully request that ROBERT ALCANTARA, the defendant, be arrested and imprisoned, or bailed, as the case may be.

```
        s/ by the Court with consent
_____
KIRAN MATHEW
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives
```

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 5th day of January, 2022

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORKs

15